Jinnifer Jeresek Mariman
Ethan Welder
John Lacey
McGARVEY LAW
345 First Avenue East
Kalispell, MT  59901
(406) 752-5566
jmariman@mcgarveylaw.com
ewelder@mcgarveylaw.com
jlacey@mcgarveylaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of THOMAS E. WELLS, deceased; and JUDITH HEMPHILL, as Personal Representative for the Estate of JOYCE H. WALDER, deceased, <br> Plaintiffs, <br><br> v. <br><br> BNSF RAILWAY CO., a Delaware corporation and JOHN DOES 1-8 <br> Defendants. | **Cause No.** CV-25-30-GF-JTJ <br><br><br> **COMPLAINT** |

## <u>INTRODUCTION</u>

1.      This case alleges bad faith conduct that turns insurance protection into an investment in accrued and ongoing human suffering.

2.      BNSF Railway Company (herein "BNSF") deliberately violates its

1

settlement and medical cost payment duties to asbestos claimants even when there is clear liability for the medical expenses of these severely injured and dying claimants. BNSF strategically violates these duties found in Montana law to use accrued asbestos claim liabilities as investment commodities.

3.      BNSF violates these duties to achieve parent company Berkshire Hathaway's express investment strategy to earn profit on "long-tail" asbestos liability during the "float" years between claim presentation and delayed claim resolution. BNSF has used this investment strategy by "buying back" insurance policies that provided insurance coverage to BNSF for the benefit of these Plaintiffs and to other similarly situated Libby Asbestos Claimants.  BNSF "buys back" these policies by receiving a lump sum of money then invests that money instead of using it for the protection purpose of the insurance and the insurers' investigation and insurance adjustment duties. This strategy, in Warren Buffet's words, is to invest money it owes to asbestos claimants because it "generate[s] far more float" since the claims "take many years to surface and even longer to evaluate and resolve," and since, for "claims arising from exposure to asbestos… payment can stretch over many decades" during which the Berkshire Hathaway companies can "invest this float for their own benefit."[1]

---

[1] Quotes are from Warren Buffet's February 24, 2018 and February 23, 2019 letters to the shareholders of Berkshire Hathaway, Inc. *See* https://www.berkshirehathaway.com/letters/2017ltr.pdf (2/24/18 letter);

4.     On April 22, 2024, despite years of protracted litigation, extensive discovery, Plaintiffs' counsel's numerous demands for advance payment of medical expenses, a unanimous jury found BNSF was strictly liable for causing the mesothelioma and deaths of two plaintiffs, Tom Wells and Joyce Walder, awarding each plaintiff $4,000,000 in compensatory damages. BNSF has appealed that award further delaying payment to Plaintiffs.  All the while continuing its refusal to Plaintiffs' recurrent request to engage in reasonable settlement negotiations and payment of medical expenses—having offered $0.00 to these Plaintiffs up and through today.

5.     BNSF's asbestos claim strategy is pursued within a robust third-party reinvestment insurance market in which insurers and even private equity firms "buy" asbestos liabilities to utilize this "float" strategy.[2] BNSF's parent company Berkshire Hathaway, Inc. and its companies have acquired billions of dollars of long-tail asbestos liability.

6.     Instead of fulfilling the claim adjustment duties attendant to these insured claims, BNSF has opportunistically breached these duties to take advantage of the fact that only a very small percentage of the elephantine mass of asbestos cases

---

https://www.berkshirehathaway.com/letters/2018ltr.pdf (2/23/19 letter)

[2] H. Santoro, *Wall Street Is Investing In Your Asbestos Poisoning*, LeverNews Jul. 10, 2024; S. Hoke, *Private Equity Wants to Buy Your Asbestos Liabilities*, Law 360, Oct.31, 2019.

can reach an enforceable judgment in any year - a phenomenon which Buffet says make the investment principal "sticky" so long as claims are not resolved by settlement. This stickiness is further enhanced by protracted, scorched-earth litigation to delay case resolution. This maximizes the investment return on extended float while asbestos claimants languish waiting their day to take to trial a clear liability claim that should not have to go to court at all.

7.      BNSF's asbestos claim strategy turns fully accrued insured claims into an investment. The real-life consequence for asbestos victims who are denied the money they need to buy an oxygen machine, literally make this an investment by BNSF in the suffering caused by withholding medical payments and reasonable settlements.

## **JURISDICTION**

8.      This action seeks equitable relief of disgorgement of profits earned through use of insurance liability as a market commodity and damages for violations of insurance claim handling duties. The amount in controversy on the claims in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Defendant BNSF Railway Company (herein "BNSF") is a Delaware corporation with its principal place of business in Texas. BNSF Railway Company is a wholly owned subsidiary of Burlington Northern Santa Fe, LLC (a Delaware limited liability company). Berkshire Hathaway Inc., a Delaware corporation, is the

sole member of Burlington Northern Santa Fe, LLC. During much of the time of the conduct alleged in this Complaint, including in the time period before September 30, 2023, National Indemnity Company, a Nebraska insurance company that was wholly owned by Berkshire Hathaway Inc., was the sole member of Burlington Northern Santa Fe, LLC.

10.     Plaintiff Jackson Wells is a citizen and resident of Washington. At the time of his death, Thomas H. Wells, was a citizen of Washington.

11.     Plaintiff Judith Hemphill is a citizen and resident of Montana. At the time of her death, Joyce Walder was a citizen of California.

12.     Defendants John Does 1 through 4 are four business entities the names of which are presently unknown. Each of the four Defendant John Does are insurers, adjusting companies and/or "persons" owing the duties alleged in the complaint as well as agents and entities related to BNSF which performed for BNSF the claim adjusting and claim handling alleged in this Complaint, and further aided and abetted BNSF's breaches of claim handling duties.

13.     Defendants John Does 5 through 8 are four business entities the names of which are presently unknown. Each of the four Defendant John Does are insurers who have settled with BNSF but retain non-delegable duties and/or contracts duties and/or committed bad faith before any such "settlement" occurred.

14.    The claim settlement conduct alleged herein occurred in Montana with respect to claims in United States District Court, District of Montana, civil action in the Great Falls Division.

15.    This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332 because there is both minimal and complete diversity of citizenship, and because the amount in controversy on the claims in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

## **BACKGROUND**

16.    For years, BNSF, as a self-insurer, and each of John Does 1-8 (collectively "Defendants") have breached their Claim Settlement Duties to Plaintiff Tom Wells and Plaintiff Judith Hemphill, claimants with Clear Liability Claims. This case alleges that all Defendants have calculatingly breached their Claim Settlement Duties to Plaintiffs to implement a strategy of Opportunistic Breach, meaning that, because the (time-value) profit Defendants make on withheld settlement payments to Plaintiffs and other Libby Asbestos Claimants exceeds what it will pay on these fully accrued insurance claims, it is profitable for Defendants to breach their Claim Settlement Duties and thereby increase the time over which they can generate income on money owed to Plaintiffs and other Libby Asbestos Claimants.

17.    To achieve justice and adequately remedy this Opportunistic Breach, it is not sufficient to compensate Plaintiffs for the emotional distress, fear, and outrage because BNSF's profit through Opportunistic Breach exceeds the amount of a compensatory damages remedy. Without an order in equity of disgorgement, BNSF's Opportunistic Breach will continue to yield a profitable outcome (i.e. regardless of the amount of tort judgments) and BNSF will continue to be financially incented to breach its Claim Settlement Duties.

18.    In addition to the claims (Claim 2, Claim 3, and Claim 4 below) for breach of the Claim Settlement Duties owed to Plaintiffs, this Complaint pleads (in Claim 1) the factual basis for a judgment that BNSF deliberately interfered with Plaintiffs' rights as insurance claimants, utilized coercive leveraging, and strategically and opportunistically breached its Claim Settlement Duties owed to Plaintiffs to secure and sustain the profits made on moneys owed to Plaintiffs and similarly situated Libby Asbestos Claimants. Specifically, BNSF used Leveraging designed (a) to exploit Plaintiffs' vulnerable positions through withheld medical expenses and zero-dollar offers, and (b) to use the claim settlement treatment of Plaintiffs' bellwether/lead case to influence the settlement value of cases following Plaintiffs' lead case and thus continue BNSF's Commodity Profit scheme.

19.    Claim 1 seeks the Court's exercise of its equitable jurisdiction to order disgorgement of the profit BNSF have made through its Opportunistic Breach

scheme, including earnings on the money needed by Plaintiffs and similarly situated Libby Asbestos Claimants for expensive cancer and end-of-life care, or even basic health needs such as supplemental oxygen. BNSF's system of delay undermines the protective purpose of insurance to create an enterprise of Commodity Profit that is a direct function of delaying and extending human suffering.

### **Meaning of Phrases Used in this Complaint**

20.    As used in this Complaint the following phrases have these meanings:

a.    "Opportunistic Breach" means the violation of clear legal duties with a strategic purpose and effect of generating profit.

b.    "Commodity Profit" means earnings on a marketable source of investment capital.

c.    "Claim Settlement Duties" means the statutory and common law duties an insurer owes to attempt good faith settlement of insurance claims with reasonably clear liability, including the duties to advance medical expenses, to conduct a reasonable investigation of facts and data supporting such claims, to attempt good faith settlement of claims based on facts derived through such investigation, and to not employ Leveraging in the claim settlement process.

d.     "Clear Liability Claims" means insurance claims in which the liability of BNSF is "reasonably clear" within the meaning of § 33-18-201, MCA.

e.     "Leveraging" means violating Claim Settlement Duties with an objective or effect to exploit insurance claimants' vulnerable position, to coerce settlements that are ill-advised for the claimant and strategically advantageous to the insurer, and/or to avoid accountability for (and preserve profitability of) Opportunistic Breach of Claim Settlement Duties.

f.     "Lead Case Strategy" means use of a litigation bottleneck and lead case procedures (with Plaintiffs' being the lead and bellwether case) as an opportunity for an insurer to create and exert superior bargaining power, employ Leveraging, and Opportunistically Breach claim settlement duties so that the insurer can derive Commodity Profit on the claim reserves while the body of litigation is drawn out.

g.     "Time-value Enhanced" refers to a characteristic of a source of investment capital when there is little time-value cost of the investment capital (e.g. nonrecovery of interest on insurance claimants' prejudgment general damages compared to market interest rates on a loan).

h.    "Sticky" refers to a characteristic of a source of investment capital when repayment of the underlying obligation is dependably controlled (e.g. because payment on asbestos claims only occurs slowly through a litigation bottleneck).

i.    "Libby Asbestos Claimants" means insurance claimants who lived and recreated by the downtown Libby railyard owned by BNSF and its predecessors in Libby, Montana, and who have presented claims in Montana state or federal courts against BNSF for asbestos disease injury arising from exposure to asbestos from BNSF's properties and activities.

j.    "Supreme Court Ruling" means *BNSF Railway Co. v. Asbestos Claims Court* ("*Eddy*"), 2020 MT 59 wherein BNSF was found strictly liable for its handling of asbestos alleged to have caused Libby Asbestos Claimants injuries.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

21.    On March 25, 2020, the day before he died from mesothelioma, Tom Wells gave his perpetuation deposition wherein he was questioned by BNSF regarding his claim that asbestos from BNSF's toxic superfund railyard caused his mesothelioma.   On September 23, 2021, Plaintiffs Jackson Wells and Judith Hemphill, as Personal Representatives for the Estate of Tom Wells and the Estate of

Joyce Walder, filed their lawsuit against BNSF for its strict liability for Decedents' asbestos-related mesothelioma and resulting deaths from exposure to the asbestos hazard at BNSF's downtown Libby railyard in Libby, Montana.

22.    The liability of BNSF for Plaintiffs' claims always was and is reasonably clear as demonstrated by the facts; the *Barnes* court's summary judgment ruling; and subsequent Supreme Court Ruling in *Eddy*;  the *Wells & Walder* court's summary judgment, in-trial, and post-trial rulings; and the jury verdict and judgment.

23.    On January 15, 2019, the Asbestos Claims Court issued a summary judgment ruling that BNSF was strictly liable for "engaging in an abnormally dangerous activity vis-à-vis its operations in Libby, Montana."

24.    On March 11, 2020, the Montana Supreme Court issued a ruling concluding that:

> Based on the above discussion, we conclude BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519.

*Eddy*, ¶ 39.

25.    The *Eddy* Court also found the following facts regarding BNSF's asbestos-contaminated railyard to be undisputed:

> The evidence BNSF presents does not dispute there were large amounts of asbestos present in its railyard and around its tracks. Central to both parties' arguments is the EPA's 2003 Initial Pollution Report. BNSF correctly points out that the document provides, "[a] total of 22 surface soil samples collected along the railroad tracks and its railyard ranged

11

from a trace to less than 1% fibrous amphibole asbestos by weight." However, reviewing the document in its entirety, it also establishes additional facts BNSF does not dispute, including that the railyard testing revealed asbestos soil levels of 2-5% and extensive areas of visible vermiculite. Therefore, by not actually disputing the entirety of the EPA's report, including the several statements that ample asbestos remained in the Libby Railyard, BNSF did not meet its burden to defeat summary judgment. . . . Thus, although BNSF cherry picks the record to cite to isolated favorable test results, it is beyond dispute that extensive asbestos existed, at high levels, on BNSF's properties.

* * *

Because it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination, and exposure to asbestos creates a great risk of harm to individuals, the Asbestos Court did not err in concluding this factor weighs in favor of finding BNSF strictly liable.

*Eddy*, ¶¶ 23, 25.

26.    The *Eddy* Court ruling is based on undisputed facts that had been known to BNSF for years, including when similarly situated claims were presented to BNSF beginning at least as early as 2001, through the briefing in the Arrowood Declaratory Action beginning in 2016, Plaintiff Tom Wells perpetuation deposition in 2020, and Plaintiffs' claims filed in 2021. The liability evidence of the extent of the asbestos contamination in BNSF's downtown Libby railyard consisted of BNSF's own analysis and sampling, and its own documents and records reflecting the same.

27.    On April 22, 2024, a jury found that BNSF was strictly liable for its abnormally dangerous activity and/or condition at the downtown Libby railyard that

fell outside its role as a common carrier. The jury further found that the abnormally dangerous activity and/or condition caused the mesothelioma and subsequent deaths of the Plaintiffs. The jury issued an award of $8,000,000 in compensatory damages following a 2-week trial.

28.    Despite repeated requests for advance payment of medical care expenses of Plaintiffs for their asbestos-related mesotheliomas, BNSF made no payments or offers of advance payment of medical expenses.  Literally, $0.

29.    Despite repeated requests for reasonable settlement of Plaintiffs' claims, BNSF made no offer of settlement, made no reasonable offer to the Plaintiffs before trial, and have made no offer to settle the verdict at the time of this filing. Literally, $0.

30.    At all times from the September 2021 presentation of Plaintiffs' claims through April 22, 2024, BNSF failed:

> a.    to make timely or reasonable settlement offers or settlement contribution offers;
>
> b.    to make reasonable attempts to negotiate a fair settlement of Plaintiffs' insurance claims; and
>
> c.    to make any settlement, payment or advance payments of any medical care expenses.

31.    These actions and failures of BNSF occurred and continue while Plaintiffs suffered and continue to suffer uncompensated losses for injuries and the resulting economic burdens and health care costs resulting from Decedents' mesothelioma injuries and end-of-life care.

32.    Because of the failures of BNSF to make a reasonable settlement or make advance payments, Plaintiffs have been and continue to be subject to unfair exploitation from their positions of disadvantage including their economic difficulties arising from Decedents' injuries.

33.    Because Plaintiffs' case against BNSF was a lead and bellwether case, with hundreds of others waiting in the wings, Defendants used the opportunity of Plaintiffs' case to implement a Lead Case Strategy of delaying resolution of the Plaintiffs' insurance claims and Opportunistically Breaching the Claim Settlement Duties BNSF owed to Plaintiffs.

34.    BNSF knew and knows the Leveraging and exploitation effect suffered by Plaintiffs, and acted and continue to act (a) with an intent to take advantage of each Plaintiffs' disadvantaged position during the settlement negotiations, (b) with intent and knowledge of the Leveraging effect of its conduct, (c) in conscious disregard of the known and intended injury to and Leveraging of Plaintiffs and other Libby Asbestos Claimants, and (d) with intent that the exploitation effect would

decrease and delay BNSF's liability exposure with respect to the Plaintiffs' claims and the claims of similarly situated Libby Asbestos Claimants.

35.    BNSF has calculated, at the expense of Plaintiffs, to pursue the advantage of the earnings it makes on the delayed claim payments to Plaintiffs and to similarly situated claimants by reason of the delay through Opportunistic Breach of claim handling duties owed on Plaintiffs' claims.

36.    BNSF has pursued and continue to pursue a claim delay strategy through Opportunistic Breach of its Claim Settlement Duties because its Commodity Profit earnings outpace the exposure it projects for its claim liability and its liability for claim handling conduct.

## CLAIM 1

### (Claim for Equitable and Disgorgement Relief)

37.    All preceding allegations are hereby incorporated in this claim.

38.    BNSF is owned by an insurance company. BNSF has pursued the claim settlement delay and deny strategies alleged in this Complaint at the direction of and for the benefit of its parent insurance company, and to fulfill its parent insurance company's investment objectives. In performing the conduct alleged in the Complaint, BNSF acted as an insurer, insurance adjuster and "person" performing prohibited claim practices within the meaning of the insurance code and the common law duties attaching to claim adjustment.  BNSF itself is also an insurer and self-

insurer with respect to the personal injury claims against it by Plaintiffs and similarly situated Libby Asbestos Claimants. BNSF is also an insurer to the extent of its "buy back" of insurance policies from its insurers Does 5-8 that provided insurance for the benefit of these Plaintiffs and to other similarly situated Libby Asbestos Claimants. BNSF's "bought back" these policies by receiving a lump sum of money from its insurers in exchange for BNSF contractually assuming those insurers' investigation and insurance adjustment duties, including duties of defense, indemnification, and settlement. BNSF also contractually agreed to indemnify those insurers. As an insurer and self-insured, BNSF owed Plaintiffs the duties in § 33-18-201, MCA, subsections (1), (4), (6) and (13)—including the duties to make advance payments, and the duty to attempt good faith settlement, and further owed the common law duties of good faith dealings with third party insurance claimants. One or more of the John Doe 1-4 Defendants performed, as agents for BNSF, the claim adjusting and claim handling on the Plaintiffs' claims against BNSF, including decisions regarding communications, claim evaluations, and claim handling to implement the Opportunistic Breach and Leveraging strategies.

39.    As described in Claims 2, 3, and 4 below, BNSF breached the statutory and common law good faith, advance payment and settlement duties it owed to Plaintiffs.

40.    BNSF's breach of the statutory and common law good faith, advance payment and settlement duties they owed to Plaintiffs is an Opportunistic Breach calculated to take advantage of Commodity Profit generated on money owed to Plaintiffs and similarly situated Libby Asbestos Claimants on their insurance claims.

41.    BNSF's Opportunistic Breach is facilitated by a Lead Case Strategy for handling Plaintiffs' insurance claims.

42.    BNSF deliberately breached its Claim Settlement Duties to Plaintiffs upon its recognition that (a) a failure to timely settle the claim in Plaintiffs' lead case would delay the need to pay settlement amounts to other Libby Asbestos Claimants, and (b) a failure to timely settle Plaintiffs' lead case and withholding of advance medical bill payment would influence the settlement value of cases following Plaintiffs' lead case.  In so acting, BNSF is a conscious wrongdoer unjustly enriched through misconduct, coercive Leveraging, Opportunistic Breach, and interference with Plaintiffs' legally protected rights.

43.    The Commodity Profit generated by BNSF on money owed to Plaintiffs and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment because it is intentionally built upon and generates profits through Opportunistic Breach of clear Claim Settlement Duties owed to Plaintiffs.

44.    The Commodity Profit generated by BNSF on money owed to Plaintiffs and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment

for the further reason that generating such profit through breach of insurance duties turns insurance claims and insurance reserves for fully accrued claims into a marketable commodity and source of speculative risk investment at the expense of the protection function of insurance, effectively destroying the legal and public policy basis for liability insurance and claim handling duties, and thereby generating profit as a function of human suffering.

45.    The Commodity Profit generated by BNSF on money owed to Plaintiffs and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment for the further reason that BNSF is a conscious wrongdoer: the profit is generated on investment capital that is available to BNSF precisely because BNSF is knowingly breaching its Claim Settlement Duties.

46.    The Commodity Profit generated by BNSF on money owed to Plaintiffs and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment for the further reason that (a) an established multi-billion dollar market exists for purchase and sale of accrued asbestos claim liability to investors (including private equity investors), (b) BNSF is using and engaged in that market and thereby treating insurance reserves and asbestos liabilities as a commodity, (c) that market depends on Time-value Enhanced and Sticky characteristics of asbestos claim reserves, and (d) BNSF enhances the time-value component by exploiting the opportunity to delay

claim resolution, and further enhance the Stickiness component by exploiting the litigation bottleneck through a Lead Case Strategy.

47.    Specifically, BNSF has exploited, or aided through claim handling services, the exploitation of the Time-value Enhanced route to Commodity Profit by deliberately breaching its duty to make "prompt" good faith settlement offers (*e.g.*, BNSF controls when claims are paid subject only to the ability of the claimants to individually secure judgments). BNSF has consistently refused to offer *any* settlement amounts.

48.    Further, BNSF has exploited, or aided through claim handling services, the exploitation of the Stickiness characteristic of its Commodity Profit from claim reserves for claims of Libby Asbestos Claimants by deliberately Leveraging Plaintiffs, the lead case that controls the litigation bottleneck. Unlike a loan, futures contract, or stock arbitrage, this investment capital source is Sticky because the investment entity is not subject to a loan default or "strike" price; rather, the payment obligation on the bundled claims comes due on discrete individual claim basis and the individual claims are litigated behind the Plaintiffs' lead case.

49.    At an average annual rate of return in excess of 11%, BNSF has earned millions of dollars on the Libby asbestos claim reserves for fully accrued clear liability claims over the past twenty years of litigation by Opportunistically

Breaching its Claim Settlement Duties to all Libby Asbestos Claimants through a Lead Case Strategy directed at Plaintiffs' insurance claim.

50.    Even if Defendant BNSF were to pay the claims of Plaintiffs and all other Libby Asbestos Claimants in the amounts of verdicts and judgments, the delay has already led BNSF to net, and continue to gain financial advantage from, profits exceeding the amounts they might pay, meaning they have been undeniably and unjustly enriched through its Opportunistic Breach and treatment of the claims as a source of capital for Commodity Profit. Equity must intervene in these circumstances of deliberated intentional wrong and Opportunistic Breach because compensatory damages are not the appropriate measure of BNSF's illicit profits, and because the object of the controlling equitable principle is to eliminate the profit from wrongful conduct.

51.    Through their claim handling conduct, Defendant John Does 1-4 have aided and abetted the Opportunistic Breaches alleged above.

## **CLAIM 2**

### **(Claim for Damages and Punitive Assessment for BNSF's Breach of Duties to Attempt Good Faith Settlement)**

52.    All preceding allegations are hereby incorporated in this claim.

53.    The value of Plaintiffs' Clear Liability Claims against BNSF has been adjudicated to be $4,000,000 per Plaintiff.

54.    At no time has BNSF made an insurance claim settlement offer for the value of Plaintiffs' claims against BNSF.  BNSF has failed to perform its duties of claims handling and adjustment of Plaintiffs' claims and the resulting offer from BNSF has been and remains $0.

55.    Liability on Plaintiffs' claims against BNSF is and has always been reasonably clear, and is now adjudicated. First, BNSF's strict liability was first established in the Asbestos Claims Court decision on January 15, 2019. Second, this decision was affirmed by the *Eddy* Court on March 11, 2020. Third, in its October 16, 2023, Order, the court in the underlying lawsuit issued its order on summary judgment finding BNSF collaterally estopped from the finding that it was strictly liable for its handling of asbestos. Further, during the course of an eleven-day trial starting on April 8, 2024, the Court denied BNSF's motion for directed verdict on strict liability and gave the question to the jury who unanimously found BNSF strictly liable to Plaintiffs.  Then BNSF filed a post-trail motion seeking to reverse the Court's and jury's prior findings regarding BNSF's strict liability, which the Court again rejected.  BNSF offered and continues to offer $0.00 in response to Plaintiffs' continued attempts to engage in reasonable settlement or to receive advance payment of medical expenses in light of these decisions.

56.    BNSF has withheld and delayed settlement offers (a) with an intent to take advantage of each Plaintiffs' disadvantaged position during the settlement

negotiations, (b) with intent and knowledge of the Leveraging effect of its conduct, (c) in conscious disregard of the known and intended injury to and Leveraging of Plaintiffs and other Libby Asbestos Claimants, (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to Plaintiffs' claims and the claims of similarly situated Libby Asbestos Claimants; and (e) with intent to use the claim settlement treatment of Plaintiffs' lead case to influence the settlement value of cases following Plaintiffs' lead case, enabling BNSF to continue BNSF's Commodity Profit scheme.

57.    BNSF has  withheld and delayed settlement offers upon BNSF's recognition that (a) a choice not to timely settle the claim in Plaintiffs' lead case would delay the need to pay settlement amounts to other Libby Asbestos Claimants, and (b) a choice not to timely settle Plaintiffs' lead case and withholding of advance medical bill payments would influence the settlement value of cases following Plaintiffs' lead case.

58.    BNSF's withholding and delaying of settlement offers constitute breach of the statutory settlement duties under § 33-18-201, MCA.

59.    BNSF's withholding and delaying of settlement offers constitute breach of the common law duties of good faith owed to third party claimants.

60.    BNSF's withholding and delaying of settlement offers is an evasion of the protection purpose of insurance so that BNSF can collect Commodity Profit,

where the money owed to Plaintiffs and similarly situated Libby Asbestos Claimants on their fully accrued, clear liability claims is the source of investment capital. Because Plaintiffs and similarly situated Libby Asbestos Claimants depend upon funds held by BNSF to pay for medical expenses, to otherwise address the harm arising from their asbestos injuries, and to secure a just resolution within their lifetimes, BNSF's Commodity Profit scheme literally makes profit a function of human suffering.

61.    As a result of BNSF's choice not to attempt settlement, Plaintiffs incurred the expense of unnecessary litigation and suffered personal damages, including, inability to be made whole for cancer and end-of-life care expenses, worry, anguish, disappointment, grief, anger, and outrage.

62.    BNSF's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of the BNSF's conduct, and, further, remove the profitability of BNSF's delay and treatment of Plaintiffs' insurance claim.

63.    BNSF's withholding and delaying of settlement offers has occurred over the periods described in the following Counts of this claim.

64.    During the period from Tom Wells March 25, 2020 perpetuation deposition and then Plaintiffs September 23, 2021, complaint against BNSF, to the April 22, 2024, verdict, all of the undisputed facts in EPA documents and BNSF's

own words and own documents—the overwhelming evidence of the extensive asbestos contamination of BNSF's railyard—were known to BNSF to be the controlling proof in the analysis of BNSF's strict liability for its conduct vis-à-vis its asbestos-contaminated railyard in downtown Libby, Montana.

65.    On January 15, 2019, the Asbestos Claims Court issued a summary judgment ruling that BNSF was strictly liable for "engaging in an abnormally dangerous activity vis-à-vis its operations in Libby, Montana."

66.    On March 11, 2020, the Montana Supreme Court issued a ruling concluding that:

> Based on the above discussion, we conclude BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519.

*Eddy*, ¶ 39.

67.    The *Eddy* Court also found:

> Because it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination, and exposure to asbestos creates a great risk of harm to individuals, the Asbestos Court did not err in concluding this factor weighs in favor of finding BNSF strictly liable.

*Eddy*, ¶ 25.

68.    Despite these proceeding adjudications of BNSF's liability, BNSF made **no settlement offers** or offers of advance payments to resolve any part of Plaintiffs' insurance claims.

24

69.    Through their claim handling conduct, Defendant John Does 1-4 have aided and abetted the breaches alleged above.  Through their retention of non-delegable duties and/or contracts duties and/or acts before any such "settlement" with BNSF occurred, Defendant John Does 5-8 have also breached the above settlement duties owed to Plaintiffs.

## CLAIM 3

**(Claim for Damages and Punitive Assessment for BNSF's
Breach of Duties to Advance Medical Expenses)**

70.    All preceding allegations are hereby incorporated in this claim.

71.    BNSF's liability on Plaintiffs' claims is and always has been reasonably clear for the reasons described above. BNSF owed claim handling duties to evaluate, adjust, and to make advance payments on Plaintiffs' claims for asbestos disease-related medical expenses under the requirements of § 33-18-201, MCA, and BNSF's common law duties of good faith.

72.    Despite multiple requests for advance payment of medical expense of Plaintiffs' mesotheliomas, BNSF made no advance payments or offers of advance payments at any time.

73.    BNSF withheld advance payment of medical expenses (a) with an intent to take advantage of each Plaintiffs' disadvantaged position during the settlement negotiations, (b) with intent and knowledge of its Leveraging and exploitation of Plaintiffs' economic difficulties, (c) in conscious disregard of the

25

known and intended injury to and Leveraging of Plaintiffs, (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to the Plaintiffs' claims and the claims of similarly situated Libby Asbestos Claimants, (e) with intent to use the claim settlement treatment of Plaintiffs' lead case to influence the settlement value of cases following Plaintiffs' lead case.

74.    As a result of BNSF's failure to advance medical expenses, Plaintiffs incurred the expense of unnecessary litigation and suffered personal damages, including the inability to be made whole for cancer and end-of-life care expenses, worry, anguish, disappointment, grief, anger, and outrage.

75.    BNSF's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of the BNSF's conduct, and, further, remove the profitability of BNSF's delay and treatment of Plaintiffs' insurance claim.

76.    Through their claim handling conduct, Defendant John Does 1-4 have aided and abetted the breaches alleged above.  Through their retention of non-delegable duties and/or contracts duties and/or acts before any such "settlement" with BNSF occurred, Defendant John Does 5-8 have also breached the above advance payment duties owed to Plaintiffs.

## CLAIM 4

### (Leveraging)

77. All preceding allegations are hereby incorporated in this claim.

78. In addition to their claim against BNSF for Decedents' asbestos-related mesotheliomas, Plaintiffs have a claim against BNSF and Does 1-4 for their bad faith and unfair insurance claim handling conduct. The latter claim is wholly separate from the liability of BNSF which BNSF self-insured or acting as an insurer.

79. BNSF's liability on Decedents' personal injury claims and Plaintiffs' wrongful death claims is and always has been reasonably clear for the reasons described above. In violation of their statutory and common law settlement duties, BNSF and its agents failed to attempt good faith settlement of Plaintiffs personal injury claims or to advance medical expenses. BNSF and its agents breached the settlement duties, failed and refused to offer any settlement amount, denied the Plaintiffs advance medical payments and forced the Plaintiffs clear liability case to trial all to further a purpose of acquiring leverage to discourage and devalue the claims against BNSF by other similarly situated Libby Claimants

80. As a result of BNSF's failure and refusal to make offers or advance payments on Plaintiffs' insured personal injury and wrongful death claims for the purpose of acquiring leverage over other claimants, Plaintiffs were forced to litigate the claims to verdict, incur the expense of unnecessary litigation and suffered personal damages, including:

    a.     inability to secure needed medical and disability related care, equipment, and services;

    b.     impairment of end-of-life decisions; and

    c.     worry, anguish, disappointment, grief, anger, and outrage.

81.    BNSF's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of BNSF's conduct, and, further, remove the profitability of BNSF's delay and treatment of Plaintiffs' insurance claim.

**WHEREFORE PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:**

1.    An award of Damages for:

    a.     financial and economic consequences of delayed or denied settlement amounts or advance payments, including lost time value of money, economic insecurity;

    b.     general damages for opportunities to live and enjoy life that were lost by reason of the of delayed or denied settlement amounts or advance payments;

    c.     general damages for losses including pain, suffering, emotional distress, anger, fear, outrage, and disappointment; and

    d.     interest on the above amounts and recovery of the lost time value of delayed payments.

2.     An assessment of punitive damages in an amount sufficient to punish and make example of BNSF's conduct, and, further, remove the profitability of BNSF's delay and treatment of Plaintiffs' claim.

3.     Equitable remedy addressing BNSF's unjust enrichment with profits generated through breach of duties to Plaintiffs on delayed payment of the insurance claims of Plaintiffs and similarly situated Libby Asbestos Claimants, including disgorgement of profits earned by reason of BNSF's breach of duties to Plaintiffs.

4.     Such other and further legal and equitable relief as is just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED this 18th day of April, 2025.

McGARVEY LAW

*/s/ Jinnifer Jeresek Mariman*
Jinnifer Jeresek Mariman
*Attorney for Plaintiffs*